## WAUKESHA MALLEABLE IRON CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 4906.

Circuit Court of Appeals, Seventh Circuit.

Oct. 31, 1933.

John E. Hughes, of Chicago, Ill., and Harvey J. Frame and Frame & Blackstone, all of Waukesha, Wis., for petitioner.

Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen. (E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, and W. Frank Gibbs, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before EVANS, SPARKS, and FITZ HENRY, Circuit Judges.

EVANS, Circuit Judge.

Petitioner's appeal is from an order of the Board of Tax Appeals which affirmed Commissioner's determination of a deficiency income tax of $17,291.51 on it for the fiscal year ending June 30, 1926. The fact findings of the Board are not disputed. Controversy arises over the soundness of the conclusions reached on the basis of such facts.

The following statement is taken from the memorandum opinion of Board Member McMahon.

On June 2, 1920, petitioner entered into an agreement with the General Motors Corporation whereby the latter leased petitioner's plant at Waukesha, Wisconsin, for a term of five years for a rental of $40,000 per annum. By the same instrument, it gave to said lessee an option to purchase the property for

the sum of $500,000, said option to be exercised at any time between July 1, 1923, and July 1, 1925. In 1923, one Glancy of the Oakland Motor Car Company, a subsidiary of the General Motors Corporation, became interested in the Waukesha division of General Motors Corporation. He organized Glancy Malleable Corporation which, on November 30, 1923, entered into an agreement with petitioner whereby the latter gave it an option commencing July 2, 1925, and expiring July 10, 1925, to purchase its property for $275,000, provided General Motors failed to exercise its option to purchase said property. Optionee, under the second option, was to make improvements upon the premises during the period of the existing leasehold and it agreed that on or before the 1st day of December, 1924, it would pay (and it did pay) petitioner the sum of $50,000 to be applied as part of the purchase price of said property in case the option was exercised and was to be a forfeit if the property were not purchased. It was further provided that in case "the General Motors Corporation shall * * * purchase said property, the Vendor will thereupon repay to the Purchaser said Fifty Thousand Dollars * * *."

Petitioner received the $50,000 down payment in December, 1924, and it was distributed to the petitioner's stockholders prior to July 1, 1925. Large sums were expended by the second optionee in improving the plant, and on July 1, 1925, petitioner executed an agreement, in accordance with the terms of the option, for the sale and transfer of the property. The option and the agreement provided for the payment of the $275,000 purchase price as follows: $50,000 in 1924; $50,000, January 15, 1926; and $25,000 on January 15th of each year thereafter until all was paid. All unpaid balances drew interest at the rate of 6%. It was also provided that payments could be accelerated at the option of the purchaser, and upon the payment of the entire purchase price petitioner was to execute and deliver a warranty deed. On January 15, 1926, $50,000 was paid, and annually thereafter, $25,000 and interest was paid.

Petitioner kept its books and rendered its income tax return on the accrual basis, and its fiscal year ended June 30. The Commissioner, in auditing the petitioner's tax return, determined that the entire profit on the sale should be included as taxable income for the fiscal year ending June 30, 1926. Petitioner complains of this ruling, and its position is that only $50,000 was actually received in the fiscal year ending June 30, 1926, and inasmuch as this sum was less than 25% of the purchase price, it was entitled to return its profit on this sale on the installment basis (section 212 (d) of the Revenue Act of 1926 (26 USCA § 953 (d). It also contends that the Board erred in including as part of the taxpayer's profits for the year 1926, the sums which were to be paid over a period of seven years, because the optionee's agreement to pay had no "readily realizable value."

In view of our conclusion respecting petitioner's first point, his other contentions will not be stated.

Section 212 (d) and Article 44 of Treasury Regulations 69 are set forth in the footnote.[1]

The question presented by petitioner is a somewhat perplexing one. When did the first $50,000 become a part of petitioner's income and subject to income tax?

Petitioner's position, we think, must be sustained, if at all, on its contention that the down payment of $50,000 became its property

[1] Revenue Act of 1926, c. 27, 44 Stat. 9 (26 USCA § 953 (d):

Sec. 212. (d) "Under regulations prescribed by the commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made."

Treasury Regulations 69 relating to the Revenue Act of 1926:

"Art. 44. *Sale of real property involving deferred payments.*—Under section 212 (d) deferred-payment sales of real property fall into two classes when considered with respect to the terms of sale, as follows:

"(1) Sales of property on the installment plan, that is, sales in which the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable year in which the sale is made do not exceed one-fourth of the purchase price.

"(2) Deferred-payment sales not on the installment plan, * * *

"Sales falling within class (1) and class (2) alike include (a) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the purchase price has been paid, and (b) sales where there is an immediate transfer of title, the vendor being protected by a mortgage or other lien as to deferred payments. * * * *"

absolutely during the fiscal year ending June 30, 1925. To support this contention, it points to the fact that the option to General Motors Corporation required a ninety day notice of the optionee's election to purchase and that inasmuch as General Motors did not give such notice, then the $50,000 became the taxpayer's property April 2, 1925. In other words, the $50,000 paid to the petitioner under the second option was moneys which it received and to which it became absolutely entitled as soon as the option to General Motors Corporation was terminated either by the time limit or by act of optionee.

But was the General Motors' option at an end before July 1, 1925—the date fixed in its option? If petitioner's right to this money became absolute in the taxable year 1925, it was by virtue of the forfeiture clause in the second option. Any contention that petitioner was entitled to the $50,000 prior to July 1, 1925, must be traceable either to the part payment of the purchase price or to the forfeiture clause of the contract. As it was not possible, prior to July 1, 1925, to trace it to the down payment or purchase price clause, therefore it must, if it can be sustained at all, be due to the forfeiture clause.

It is therefore necessary for us to find that this payment had become forfeited during this period. Under the taxpayer's first option, General Motors Corporation had the right at any time from July 1, 1923, to July 1, 1925, to exercise its option. True, it was required to give a written ninety day notice of its election to purchase. But such provision was for the benefit of the seller. The latter could have waived this requirement, and there is no question but that it would have done so if it could have thereby received a purchase price of $500,000 instead of $275,-000. Had the petitioner, after April 2, 1925, notified the General Motors Corporation that because of its failure to give written notice of its intention to exercise the option, it was no longer bound thereby, then the rights of the General Motors Corporation under its option would have expired and the $50,000 down payment by the second optionee would have belonged to petitioner. But during the three months intervening between April and July, had General Motors tendered the $500,000 and petitioner accepted it, then the $50,000 paid by the second optionee would have had to be returned to it. In other words, the $50,000 did not become the property of the petitioner until the option to General Motors Corporation expired, namely, on July 1, 1925. The parties to the second option so understood

the situation. Not until July 1, 1925, did the petitioner and the second optionee proceed to consummate the sale in accordance with the terms of the second option. Then it was that the $50,000 down payment under the second option was recognized as moneys belonging to petitioner. The agreement thus made on the 2nd of July recites:

"That the said Purchaser (second optionee) hereby agrees and binds itself, its successors or assigns to pay, or cause to be paid, to the Vendor (petitioner), its successors or assigns, the sum of Two Hundred Seventy-five Thousand Dollars ($275,000.00) in the manner following: Fifty Thousand Dollars ($50,000.00) having been heretofore paid by the Purchaser to the Vendor, the receipt of which is hereby acknowledged by the Vendor; Fifty Thousand Dollars ($50,000.00) on January 15, 1926 * * *."

In other words, petitioner by this agreement executed on July 2, 1925, recognized for the first time that the first $50,000 was part payment of the purchase price and was not a forfeiture.

We have approached the solution of this question from another angle. What would have been the liability of the taxpayer had the Commissioner included this $50,000 in petitioner's income in the fiscal year in which it was received? Petitioner would have properly answered that the money was in its possession but did not belong to it and was not part of its income because it was under an obligation to return it if General Motors Corporation exercised its option to buy. That status never changed until the first option expired. To determine when that option expired we must look to both provisions of the option, which read:

"The Company * * * does hereby * * * give to the Corporation an option to purchase all of the property covered by this lease for the sum of Five Hundred Thousand Dollars ($500,000.00); said option of purchase to be exercised at the option of the Corporation *at any time between the 1st day of July, 1923, and the 1st day of July, 1925.*

"The Corporation agrees that it will, if it fails to exercise the option to purchase, pay to the Company on or before July 1, 1925, rental to the amount of One Hundred Thousand Dollars ($100,000.00) in addition to the annual rental hereinbefore specified.

"If the Corporation shall desire to exercise its option to purchase it shall, *on or before ninety days prior to the time it desires to exercise said option,* give notice in writ-

ing to the Company of such desire by depositing said notice in the United States mail registered and addressed to the Company at Waukesha, Wisconsin * * *."

Construing these two provisions together we think it is clear that the option to General Motors Corporation could be exercised by the optionee "at any time between the 1st day of July, 1923, and the 1st day of July, 1925." The requirement that the optionee should give notice in writing to the company "ninety days prior to the time it desires to exercise said option" was for the benefit of the optionor and could be by it waived. It likewise afforded grounds for the optionor's termination of the option if it saw fit so to do, after April 1, 1925.

There is still another reason why we conclude that the $50,000 should be included in petitioner's income for the fiscal year ending June 30, 1926, for the purpose of determining its profits derived from this sale. Glancy Malleable Corporation paid this money under an agreement which gave to it the right to elect whether to buy the property or to forfeit the down payment. Its option to buy could be exercised only between July 2 and July 10, 1925. Until it exercised its option to buy or not to buy, petitioner could not say whether the payment belonged to it as a forfeiture or as a part payment of the purchase price. When the time arrived for the exercise of its option, the optionee chose to buy and therefore then, and only then, did petitioner's possession of the money become absolute. Then it was that petitioner learned that the money belonged to it *as part purchase price of the property*. As against the second optionee, petitioner could not have declared a forfeiture until said optionee failed to exercise its option during said period. As this option did not begin until July 2 and lasted to July 10, the money could not have belonged to petitioner as forfeiture money until July 10.

■ Inasmuch as the initial payment, as that term is defined by the statute, included "payments received in cash or property other than evidences of indebtedness of the purchaser *during the taxable period in which the sale or other disposition is made*," the two payments of $50,000 each must be added to determine the per cent which the payments bear to the total purchase price. As they exceed 25% of the purchase price, the sale was not a sale on the installment plan as defined by Article 44 of Treasury Regulations 69.

■ We have been not a little troubled lest injustice be done petitioner because of the form of his so-called second option agreement. In other words, did the parties not make an actual sale of the property when they executed the so-called second option? What effect can be given to the provisions of the agreement whereby the optionee was to make substantial improvements and did place $150,000 of improvements on the premises before the option to General Motors expired? What real expectation was there that General Motors Corporation would pay $500,000 for the property which its subsidiary could acquire one day later for $275,000?

These questions and their answers, while perplexing, still do not overthrow the provisions of the written agreements. The parties chose to speak through their carefully written contracts. They chose to avoid the language of a sales contract and the rights which a purchaser assumes by such a contract. They chose to adopt language which established the rights of an optionee rather than the liability of a purchaser. At the same time they respected the rights of the General Motors Corporation under its option although apparently the second optionee was the right hand of General Motors Corporation and probably acted for it to force down the purchase price from $500,000 to $275,000. Notwithstanding an impression that the second optionee was possibly the instrumentality of the first optionee, we are compelled, in view of the written language adopted by the parties, to approach the disposition of the tax question before us on the assumption that the written contracts of the parties embodied their true agreements and that the second contract which petitioner negotiated was not a sales contract but an option agreement.

■ Little need be said concerning petitioner's second contention. The evidence amply justified the Commissioner in attributing to the deferred payments a "readily realizable value." The following facts sustain this statement. The promisor was a responsible party. It had paid down $100,000 on a $275,000 transaction. It had expended more than $150,000 in permanent improvements on the property purchased. The yearly payments of $25,000 covering a period of seven years drew interest at 6%. The contract, while not negotiable, was assignable. No other evidence was offered by petitioner tending to show in the slightest degree that such an agreement so amply secured did not have a "readily realizable value."

The order of the Board of Tax Appeals is

Affirmed.